E. Robert **CORRIGAN** et al.

v.

Edward T. **DONILON** et al.

No. 80–332–Appeal.

Supreme Court of Rhode Island.

Aug. 4, 1981.

---

Natale L. Urso, Thomas J. Liguori, Westerly, for plaintiffs.

Vincent J. Piccirilli, Providence, for defendants.

## OPINION

KELLEHER, Justice.

The United States District Court for the District of Rhode Island seeks the advice of the justices of this court pursuant to our Rule 6. The question posed by the District Court is as follows:

"What rights under the statutory law of the State of Rhode Island, if any, do the above named long-term substitute teachers, on the basis of the facts found in the decision of the Federal District Court, attached hereto, have with respect to notice and hearing upon termination of their status as long-term substitute teachers?"

This inquiry arises because of a suit filed in the District Court by a group of long-term substitute teachers who had worked within the Providence school system. They claim that the Providence School Committee (the committee) and the Superintendent of Schools (the superintendent) have violated their rights to due process by terminating their positions as long-term substitutes without a hearing.

The controversy was submitted to the District Court on an agreed statement of facts. The court found that the long-termers had been employed for at least three years when they received letters dated February 4, 1977, from the superintendent, advising them that their employment would terminate on the last day of school in June of that year. The letter noted that a resolution to this effect would be considered by the committee at its mid-February 1977 meeting. The teachers were invited to attend the meeting and be heard before the resolution was acted upon. The committee adopted the resolution, and plaintiffs were subsequently notified of the termination of their employment, effective at the end of the 1976–77 school year.

In early March 1977, plaintiffs asked the committee for a statement explaining why their employment was being terminated and for an opportunity to appear before the committee. It is conceded that although the committee had every intention of listening to plaintiffs, the hearings were supposed to take place after the committee had heard from other teachers who for a variety of reasons had received their termination notices. As of the date when the District Court sought our assistance, plaintiffs had not appeared before the committee.

The plaintiffs seek relief in the Federal Court pursuant to the provisions of 42 U.S. C.A. § 1983 (1974), claiming that they were denied their due-process rights by the committee's failure to provide either pre- or post-termination hearings and that the committee, in terminating their employment, acted arbitrarily and capriciously.[1] The District Court concluded that before it could properly assess plaintiffs' claim, it must, before proceeding any further, determine the nature of their "entitlement" under state law. Thus, the District Court's request for our assistance ensued.

Throughout this litigation, plaintiffs have contended that because they served continuously and satisfactorily for a period of at least three years within the Providence school system, they had acquired tenure pursuant to the pertinent provisions of G.L. 1956 (1969 Reenactment) chapter 13 of title 16, otherwise known as the Teachers' Tenure Act (Tenure Act). Accordingly, they argue that they are entitled to all the rights accruing to a tenured teacher, including the right not to be dismissed except for good and just cause. They also claim that it matters little what title the committee chose to give them; once they had completed three successive years of labor in the educational vineyard, they had acquired tenure together with all its due-process safeguards.

■ In *Jacob v. Board of Regents for Education*, 117 R.I. 164, 169, 365 A.2d 430, 433 (1976), we pointed out that the key to tenure as provided by G.L. 1956 (1969 Reenactment) § 16–13–3 is the successful completion of three successive *annual* contracts, which three-year term of service constitutes a probationary period. Once such an individual has passed muster for three years, he or she can only be dismissed after a hearing at which the school committee must show that there is good and just cause for the teacher's dismissal. *See Schiavulli v. School Committee*, 114 R.I. 433, 334 A.2d 416 (1975). We also noted in the *Jacob* case that even though § 16–13–2 entitled a probationary teacher to a statement about the

reasons for dismissal or nonrenewal, the good-and-just-cause standard of § 16–13–3 and its burden of proof were inapplicable. The probationary teacher, we said, because of § 16–13–2 was to be afforded the opportunity to appear before the committee and attempt to convince the committee that it had made a mistake in reaching the conclusion that it did. We also emphasized that the committee should listen to the probationary teacher in an objective manner and fairly consider its original decision.

Although there is no statutory definition regarding what constitutes a long-term substitute, the litigants have apparently adopted the definition set forth in the collective-bargaining agreement in effect between the teachers and the school committee for the 1976–77 school year. This agreement defines a long-term substitute as "a person appointed by the School Committee to serve in a position for a period of time not to exceed one semester."

■ After a thorough examination of the applicable statutes and the case law decided thereunder, we are convinced that a long-term substitute teacher is not encompassed within the provisions of the Tenure Act. Hence, a long-termer serving under a semester contract does not acquire tenure no matter how long the length of service. The Tenure Act specifically provides that to acquire tenure, the teacher must have served for a period covered by three successive annual contracts. In fact, § 16–13–2 in its pertinent portion specifically provides:

> "Teaching service shall be on the basis of an annual contract, except as hereinafter provided, and such contract shall be deemed to be continuous unless the governing body of the schools shall notify the teacher in writing (on or before March 1) that the contract for the ensuing year will not be renewed * * *."

The three-year probationary period serves two purposes. It gives the school committee and its administrative staff an opportunity to evaluate the probationary teacher, and at the same time it provides the proba-

---

1. The District Court dismissed an equal-protection claim made by plaintiffs.

tioner with an opportunity to correct any deficiencies that may arise prior to a determination of the grant of tenure. It is only after an individual has successfully completed the probationary period that tenure is awarded. However, the General Assembly has made it clear that in the event the committee believes that the probationer, in discharging his or her pedagogical duties, has failed to measure up to the committee's standard of proficiency, then the committee is under no obligation to prove good and just cause for its failure to renew the contract.

Recently, in *Berthiaume v. School Committee*, R.I., 397 A.2d 889 (1979), we concluded that although substitute teachers may be regularly employed, they may not necessarily be teaching under an annual contract. Although we held in *Berthiaume* that per diem substitute teachers who worked for more than 135 days in a single school year were regularly employed for the purpose of receiving compensation, there remained a distinction between substitutes who are regularly employed and those who are regular teachers. Thus, we concluded that those substitute teachers who were regularly employed were entitled to greater compensation than per diem substitutes, but we cautioned that nothing within that statute mandated equal pay for regular and substitute teachers. *Id.* 397 A.2d at 895.

Likewise, the long-term substitutes in this case may have been employed for more than three years, but merely working for three consecutive years cannot be fairly equated with teaching under annual contracts for the same period. Our reasoning is simply that a long-term substitute, although regularly employed, is not subjected to the same supervision and evaluation necessarily afforded a probationary teacher because the school committee has received no assurance that the substitute is committed to remaining within the teaching profession or within the particular system. During this current term in *School Committee v. Board of Regents for Education*, R.I., 429 A.2d 1297 (1981), we specifically ruled that the only teachers who could take advantage of the provisions of the Tenure Act were tenured teachers allegedly dismissed for cause and probationary teachers whose contract for yearly employment was not to be renewed.

Even though there is no statutory definition of what constitutes a long-term substitute, it is obvious that a substitute teacher is a teacher who takes over a class when the regular teacher is absent for any number of reasons. *Amos v. Board of School Directors*, 408 F.Supp. 765, 795 (E.D.Wis.1976). In fact, the District Court's opinion indicates that the long-termers' employment had been terminated because "a teacher for whom they had served as a long-term substitute and who had greater seniority would be returning to employment." There is a difference between a substitute teacher and a permanently or regularly employed teacher. The General Assembly recognized this difference, and this recognition is to be found in the teachers' tenure legislation.[2]

2. Public school teachers first received tenure when the General Assembly at its January 1946 session enacted P.L. 1946, ch. 1755, entitled "An Act to Guarantee and to Improve the Education of Children and Youth in this State by Providing Continuous Teaching Service." Although we have been unable to discover much in the way of legislative history of the events prior to the enactment of ch. 1755, the front page of the Providence Journal for April 10, 1946, does describe the passage of the tenure legislation on the preceding day while it was being considered on the floor of the House of Representatives.

Representative Ira T. Williams, described as the father of a teacher, decried the "miserable pay" received by the profession. "No won-der," he said, "teachers are old maids." Representative Williams, with his reference to teachers' low pay and their single status, might have believed that the tenure bill would bring an end to a practice then prevalent in many communities in which a single, female, regularly employed teacher, after heeding Cupid's call and promising to love, honor, and obey, would soon find herself either a retiree or a substitute teacher.

Interestingly enough, § 4 of ch. 1755, which relates to the committee's obligation to furnish a statement of good cause for dismissal, contained a proviso that stipulated that "[nothing] in this section shall prevent the retirement of any teacher under a rule of the school committee affecting marriage." This proviso remained comparatively unnoticed until the January 1965

Substitutes, be they long term or per diem, may be certified and at times regularly employed, but in the opinion of the members of this court they remain tenureless teachers.

█ As a result of the foregoing analysis, we conclude that the sole statutory recourse for the substitute teacher who wishes to challenge the school committee's termination of his or her employment may be found within the provisions of G.L. 1956 (1969 Reenactment) § 16–39–2, which reads:

"Any person aggrieved by any decision or doings of any school committee or in any other matter arising under any law relating to schools or education may appeal to the commissioner of education who, after notice to the parties interested of the time and place of hearing, shall examine and decide the same without cost to the parties involved."

Parenthetically, we would point out that anyone aggrieved by a decision of a school committee when it is conducting a hearing pursuant to § 16–39–2 is entitled to have the committee's decision reviewed on appeal to the Commissioner of Elementary and Secondary Education and further review of the commissioner's findings may be had before the Board of Regents for Elementary and Secondary Education, and if, after this combination of appeals has been exhausted, someone is still aggrieved, judicial review may be had to this court by way of common-law certiorari. See *Slattery v. Cranston School Committee*, 116 R.I. 252, 354 A.2d 741 (1976) and P.L. 1981, ch. 32, sec. 3, specifically §§ 16–60–6(9)(h) and 16–60–4(9)(h).

session of the General Assembly when, on March 5, 1965, Representative Eleanor F. Slater, the chairperson of the Education Committee of the House of Representatives, introduced a bill entitled simply "H–1403," which was an act that had for its specific purpose the deletion of the so-called matrimonial clause. In reporting the bill's introduction, the Providence Journal edition of March 6, 1965, informed the reader that, much to the chagrin of the members of the Pawtucket Teachers Alliance, the Pawtucket School Committee was relying on the matrimonial stipulation as the basis for denying tenure to married female teachers.

Doctor William P. Robinson, who was then Commissioner of Education, was reported as having said that the school committee was within its rights; he pointed out that in 1946 the marriage proviso was inserted primarily because during World War II the various school committees relied heavily on the services of married female teachers. According to Dr. Robinson, there was substantial legislative sentiment in 1946 that such a group should not be afforded tenure. Representative Slater's bill experienced a quick trip through both houses of the Legislature and became law on March 31, 1965.